## KNOTT P. BRAY *vs.* JOHN D. BATES & another.

When a bottomry bond is given to secure debts for which simple contract securities have been previously given, the bond cannot be regarded as merely collateral security, but the simple contracts are merged in the bond, and the previous securities cannot afterwards be enforced.

B. made a loan to A., on A.'s vessel, and it was agreed between them, among other things, that any merchandize purchased abroad, with B.'s consent, with the freight money earned on the outward voyage of the vessel, should be shipped to B. for sale on commission : When the vessel was about to sail, B. advanced money to A. on the outward freight, and A. agreed that said freight should be remitted to B.'s correspondent abroad, for B.'s account, B. to account therefor to A. : B. gave direction to the master of the vessel to remit said freight accordingly, except enough thereof to purchase a return cargo of salt at Cadiz, and to ship the salt to order, and send the bill of lading to B. : The master, at A.'s request, wrote to B. agreeing to obey said directions ; and he obeyed them, and purchased a cargo of salt at Cadiz, which was shipped by C., A.'s agent, and consigned to order : The master signed duplicate bills of lading, one of which was indorsed by C. and forwarded to B. : Before the vessel returned, A. gave to B. a bottomry bond to secure about four fifths of all that was due from him to B., and a negotiable note, secured by mortgage, for the balance : On the return of the vessel, the master delivered to A. the other bill of lading, which was not indorsed, and A. assigned it to the master, and also gave him a mortgage of the salt. *Held,* that the agreement between A. and B. as to the return cargo, was superseded and extinguished by the bottomry bond and note ; that the said assignment and mortgage to the master were valid ; and that the master was entitled to the cargo.

Goods were consigned to order, and one of the bills of lading was indorsed by the shipper, who was agent of the owner of the vessel and goods, and was forwarded by the master of the vessel to B., who, on the arrival of the goods, had no other right to them : After the arrival of the goods, the owner indorsed the duplicate bill of lading to the master, and mortgaged the goods to him : B. entered the

goods at the custom house, as owner, in opposition to the master's attempt to enter them, and took them from the vessel, under a custom house permit, the master being on board, objecting and claiming the goods as his own. *Held,* that this was a conversion of the goods by B., and that he was liable to the master in an action of trover.

TROVER for 15,000 bushels of salt. The parties submitted the case to the court, on the following agreed statement of facts :

On the 4th of June 1842, Nicholson Broughton, by his deed of that date, mortgaged said salt to the plaintiff, to secure payment of a promissory note given to him by said Broughton for $3000, payable on demand with interest. The salt was then on board the barque Mary Broughton, which was then, and always before, owned by said Nicholson, and had then arrived at Boston from Cadiz, and of which the plaintiff then was and before had been master. The said note was given to the plaintiff in settlement of an account, which included, among other things, the plaintiff's wages and commissions on the last voyage of said barque.

The salt was shipped at Cadiz, by Alexander Burton, to be delivered at Boston, " unto order ; freight for the said goods nothing, being owner's property ; " and the plaintiff signed bills of lading, on the 7th of April 1842. When the aforesaid mortgage was made by Broughton, he assigned one of the bills of lading, by this indorsement thereon : " Value received I assign and transfer the within to Knott P. Bray.

                                                N. Broughton."

Before April 1841, the defendants had transacted business with said Broughton, and had lent him large sums of money on various securities. In April 1841, said Broughton was building said barque, and the defendants, at his request, advanced to him $6000 on the same, according to the following agreement : " Boston, April 22d 1841. Loaned to Nicholson Broughton on his ship now building for him by Mr. Currier 3d, at Newbury, six thousand dollars. The conditions of this loan are as follows : A charge of two and a half per cent. commissions on $6000, and interest till paid. Payment to be made in six months ; otherwise, an additional commission of

$2\frac{1}{2}$ per cent to be charged.    This loan, however, in no event, is to continue longer than six months from this date, unless we consent thereto.    A commission of $2\frac{1}{2}$ per cent. on such part of the ship as may be sold.    A similar commission on supplies, &c. for sea, and all other disbursements in this port. A commission on the fit or charter, say $2\frac{1}{2}$ per cent., unless a broker is employed, when we are to charge $1\frac{1}{4}$ per cent.    Any investments of freight money in merchandize to be made with our consent, and shipment made to our consignment for sales, on which the usual commission of guaranty, of five per cent., to be charged.    For effecting insurance, we are to charge but $\frac{1}{4}$ per cent.    When the ship is ready for sea, if we can agree with Mr. Broughton upon a price to be paid for one half, we will become purchasers, jointly with Captain Samuel Thaxter, who is to command the ship, of one half said vessel ; and then the ship to be sailed on our joint risk, and to ʻbe engaged in the Havana and Russia trade, or employed in freighting, as may appear most for the interest of the con-cerned.    If we cannot agree upon a price for one half the ship, then the profit or loss on sailing this vessel is to accrue to Mr. Broughton's account.    Upon payment of our advances, and settlement of our account, the ship to be conveyed to Mr. Broughton on demand.                                Bates & Co.

" Agreed to above.                                N. Broughton."

On the 10th of August 1841, the defendants made a further advance, on the same vessel, of $2271·86, which, by an indorsement upon the agreement last mentioned, was stated to be made upon the terms in that agreement contained.    On the 1st of October 1841, said Broughton executed to the defendants an instrument, purporting and intended to be a bottomry bond on the same vessel, to secure the sums advanced as aforesaid.    The condition of this bond was in the terms copied in the margin.*

---

* Whereas the said Bates & Co have this day lent and advanced unto the said Broughton, the sum of ten thousand dollars, at bottomry, on the body tackle and appurtenances of the good bark Mary Broughton of Marblehead, of the burthen of —— tons, the said Nicholson Broughton being the sole owner

On the 9th of November 1841, when said vessel was about to proceed from New Bedford to Amsterdam with a cargo of oil, the defendants advanced to said Broughton $3500, on the outward freight, and he gave them a receipt for said sum, (stating therein, that the same was indorsed on the agreement aforesaid of April 22d 1841,) and an agreement that the net freight, after defraying certain expenses, should be remitted to their correspondents at Rotterdam, for the defendants' account, they to account for it to Broughton. At the same time, this advance was indorsed, as follows, on said agreement of April 22d : " November 9th 1841. Received on account within, as per memorandum this date, three thousand five hundred dollars.                              N. Broughton."

Now, the condition of this obligation ; that if the said Nicholson Broughton shall pay, or cause to be paid, to the said Bates and Thaxter the sum of eight thousand two hundred and seventy one $\frac{86}{100}$ dollars, as per agreement dated twenty second day of April 1841, and interest thereon, within six months from 1st October 1841, then this obligation to be void ; otherwise to be and remain in full force and virtue. And in consideration of, and as security for, said loan as aforesaid, the said bark Mary Broughton is, by these presents, assigned, pledged, mortgaged, set over and conveyed to the said Bates and Thaxter, their heirs and assigns ; the certificate of the registry of which vessel is as follows . [Here the registry documents were inserted.]

It being mutually understood and agreed that, in case the amount of said loan and interest, or any part thereof, according to the terms of these presents and the agreement 22d April 1841, shall remain due and unpaid to said Bates and Thaxter, after the expiration of six months, the said Bates and Thaxter may take possession of said bark and appurtenances, and sell the same at public auction, in order to satisfy what may then remain due, without any proceedings in court or otherwise, for the purpose of authorizing such sale, and thereupon may execute and deliver a sufficient bill of sale, to transfer com pletely to any purchaser or purchasers all title and property in and to the said bark Mary Broughton and appurtenances, to the said Nicholson Broughton, as owner thereof, now belonging. The said Bates and Thaxter thereupon to account to the said Nicholson Broughton for any surplus of such sale, after paying all charges and expenses. And in case of such sale as aforesaid, the said Nicholson Broughton, executors, administrators, or assigns, shall, whenever thereto requested, make, execute and deliver to such purchaser or purchasers another bill of sale of said bark and appurtenances, in which the register shall be recited as above, for the transferring completely to said purchaser or purchasers all the rights, interests and claims of said Nicholson Broughton, executors, administrators or assigns, as owner of said bark Mary Broughton.

                                        N. Broughton, (Seal )

On the 30th of November 1841, the defendants wrote to the plaintiff the following letter: " You will have been informed by Mr. N. Broughton of our arrangement with him to receive, in Europe, the proceeds of the freight of the barque under your command, for which we are to account to Mr. Broughton in Boston. It is our understanding that you are to remit from Amsterdam, to our friends, Brothers Nottlebohm, Rotterdam, for our account, all of your outward freight money, excepting enough to pay your necessary expenses at Amsterdam. And, in the event of your going to Cadiz, you are to retain enough to purchase there a cargo of salt for this market, to our consignment. Should no other preferable employment offer for the barque, and you be induced to go to Cadiz for salt, you will be particular to give us early advice of your intention, that we may effect insurance. You will please acknowledge receipt of this letter as your instructions regarding the disposition of the outward freight money. Should you load salt at Cadiz, the same may be shipped ' to order,' and the bill of lading sent to us. We remain, &c.

Bates & Co."

On the 8th of December 1841, Broughton wrote his letter of instructions to the plaintiff, as master of the barque, and directed him to proceed with the outward cargo to Amsterdam, and deliver it there ; and if no freight should be offered for the United States, that would give a certain specified sum, to proceed to Cadiz for a cargo of salt, after retaining enough of the freight money to defray the necessary expenses at Amsterdam, and to purchase salt at Cadiz ; and to remit the balance of said freight money to Brothers Nottlebohm, at Rotterdam, for the account of the defendants ; and to advise Broughton of the plaintiff's proceedings ; and to return to Boston, touching at Marblehead, if the wind should be favorable ; the plaintiff to be allowed $80 per month, wages, and two per cent. on the amount of the freight home, valuing the freight on the salt at $2000, in lieu of perquisites. The plaintiff, in writing, at the bottom of a duplicate of these instructions, held by Broughton, agreed to comply therewith.

On the 9th of December 1841, the plaintiff replied to the above letter of the defendants of November 30th, that he had received it, and would bear it in mind, on his arrival in Europe. On the next day (December 10th) Broughton wrote to the plaintiff stating that this reply to the defendants' letter was not such as they desired, and requested that the receipt of that letter should be acknowledged by the plaintiff, in this form: "Your letter of 30th November is received, and due note made of its contents. As directed by you, and instructed by Mr. Broughton, I will remit to Brothers Nottlebohm the amount of my outward freight, less the necessary expenses of the barque at Amsterdam, and enough to purchase a cargo of salt, should I decide to go to Cadiz. In this case the cargo is to be consigned to order, and a bill of lading sent to you, with timely orders for instructions." And on the 11th of December 1841, the plaintiff addressed a letter to the defendants in the precise terms above proposed by Broughton.

The said barque sailed, on the 12th of December 1841, under the plaintiff's command, and the outward freight, after reserving enough to defray the expenses at Amsterdam, and to purchase a cargo of salt at Cadiz, where the plaintiff decided to go, was remitted, agreeably to instructions. The plaintiff proceeded to Cadiz, and through the agency of Alexander Burton, the American consul there, purchased, with the reserved freight money, a cargo of salt. The invoice thereof, dated April 5th 1842, signed and certified by said Burton, stated that the cargo was shipped by order of the captain, Bray, and consigned to order. The bills of lading of the salt were as hereinbefore stated. One of these bills was indorsed by said Burton, and forwarded by the plaintiff to the defendants, in a letter dated April 8th 1842, saying that it was done " as per instructions," and was received by the defendants before the arrival of the barque. They thereupon made a contract for the sale of the salt, and Broughton, upon hearing thereof, called on them and said he would not sanction it. The other bill of lading, with the invoice, was delivered to Broughton, by the plaintiff, on the arrival of the barque, and

Broughton indorsed this bill, and delivered it to the plaintiff, as before stated. These bills were dated April 7th 1842, and the barque sailed for Boston, from Cadiz, on the next day.

Before this time, Broughton was indebted to the defendants for a loan of $6000, made on the 1st of February 1841, upon one half of his barque Chusan, and for an advance of $4000, made on the 13th of September 1841, upon one half of his barque Zotoff, secured by bonds in form like that respecting the Mary Broughton, hereinbefore described; for an advance of $6000 on a barque then building, and on the stocks at Newbury, part of which sum, viz. $4457·09, was advanced January 11th 1842, and the residue January 27th 1842; for an advance of about $1500 on a cargo of salt at Marblehead, consigned by Broughton to the defendants; and for the afore-mentioned loans on the Mary Broughton, with the $3500 indorsed on the aforesaid agreement of April 22d 1841, and charged in the defendant's account, hereinafter mentioned, as an advance " on the Mary Broughton's freight to Amsterdam," and as stated in the aforesaid agreement of November 9th 1841.

At the time of the advance of $4457·09, above mentioned, a contract, dated January 11th 1842, was made between the defendants and Broughton, stating that the barque aforesaid, on the stocks, should be held in mortgage for that sum, and for any further sums that might be advanced, not exceeding $6000.

In March 1842, the defendants, holding the aforesaid instruments intended as bottomry bonds, and the mortgage on the said barque on the stocks, were advised by counsel that it was doubtful whether said bonds were any thing more than mortgages, and that the said cargo of salt at Marblehead, though nominally pledged to them, being in the possession of Broughton, was liable to attachment by his creditors. The defendants thereupon proposed to Broughton that he should carry into effect their original intentions, by giving them possession of the cargo of salt, (which was done,) and by executing other bottomry bonds. He acceded to this proposal, and counsel were instructed

by the defendants to prepare such bonds. At this time no mention was made of any agreement as to the freight of the Mary Broughton, and no instructions were given relative thereto. While the papers were in preparation, the defendants made up their account with Broughton, to March 1st 1842, including the loans and advances aforesaid, and all their demands against him, and their liabilities on his account, commissions, liabilities on premium notes, &c. and the said sum of $3500, stated to have been an advance on the Mary Broughton's freight ; and the cash balance, in favor of the defendants, was the sum of $34,598·87. This balance was divided into four sums, for one of which, $17,000, a new bond was given on the Mary Broughton; for another of which, $8000, a new bond was given on the Chusan ; and for another of which, $5000, a new bond was given on the Zotoff. [These bonds secured a marine interest of eleven per cent., &c., as stated in the opinion of the court, *post.* 249.] For the remaining sum of $4598·87, said Broughton gave a promissory note to the defendants, payable in one month, with interest, and also made to them a mortgage, to secure said note, of the new barque aforesaid, on the stocks, in which mortgage it was also stipulated that said barque should be held by them for any moneys that might be due on the three bottomry bonds aforesaid. At the same time another instrument was executed by said Broughton to the defendants, stating the said bottomry bonds and mortgage, and the pledge of the said salt at Marblehead, and that the new barque and the salt were of greater value than the amount lent thereon, and that the defendants had requested further security for the sums lent on bottomry, and agreeing that the new barque and the salt should be held for such sums and interest, as might be due on the aforesaid loans, and interest. The said bottomry bonds, mortgage and agreement were all executed on the 5th of March 1842 ; so that the whole amount of said balance of $34,598·87, was covered by these securities. When they were executed, it was said by the counsel who prepared them, in reply to a question put by said Broughton, and in presence of the defendants, that the

old bottomry bonds would of course be given up, when the new ones should be delivered ; but no allusion was made to any lien on the freight of the Mary Broughton, or the proceeds of said freight. At the same time, the defendants engaged to make a further advance to said Broughton, and afterwards did advance to him the sum of $2600. They also gave to the said Broughton the following writing: "Boston, 5th March 1842. Dear Sir : In giving us the mortgage to-day on the whole of the new vessel which you are now building at Newbury, we agree that when she shall be fully equipped for service, we will reconvey to you one fourth ($\frac{1}{4}$th) share, or, if sold in that state, we will pay over to you one fourth of the money we may obtain for her.

Bates & Co."

At that time, (March 5th 1842,) and for some time afterwards, the defendants supposed that the security held by them was more than sufficient to satisfy all their demands. They afterwards sold the salt at Marblehead, and carried the proceeds thereof to Broughton's credit on account.

The Mary Broughton arrived at Boston on the 4th of June 1842, very early in the morning ; and while she lay in the stream, and before her arrival at the wharf, the master (the plaintiff) left her in charge of the first mate, and went to Marblehead, where Broughton resided, and returned to Boston, with him, early in the same forenoon; and Broughton, soon afterwards, on the same day, made the mortgage and assignment of the bill of lading, before mentioned, to the plaintiff.

In the mean time, while the plaintiff was absent from the vessel, the defendants sent a person on board, after she arrived at the wharf, to take possession of her and of the cargo. In the afternoon of the same day, and after the making of the mortgage by Broughton to the plaintiff, the defendants asked the plaintiff for the invoice. He refused to deliver it up, and claimed the salt, as having been conveyed to him as aforesaid.

After the arrival of the vessel, and before she was entered at the custom house, the defendants applied to enter the salt

21 *

but the officer declined to enter it, "because it is not in rule to enter the cargo before the vessel." On Monday, June 6th, the officer sent for the plaintiff to enter the vessel ; and when he arrived at the custom house, Thaxter, one of the defendants, was waiting there to enter the salt ; and as soon as the vessel was entered, the officer took up Thaxter's papers and proceeded to enter the salt. The plaintiff claimed to enter it, and for that purpose presented an entry, with a bill of lading consigned to order, not indorsed by Burton, but by Broughton, to him. Thaxter exhibited one indorsed by Burton, and the officer said that gave him the right to enter it. The plaintiff remonstrated against his being permitted to do so. The entry was made by the defendants, *as owners,* and completed, and they gave bond to produce an invoice and pay duties. Soon afterwards, in pursuance of a permit, the defendants took the salt from the vessel, (the plaintiff being on board and objecting, and claiming it,) and disposed thereof, crediting the net proceeds to Broughton. The plaintiff remained master of the vessel, and was, from time to time, on board, until the salt was taken away by the defendants.

When Broughton made said mortgage and said assignment of the bill of lading to the plaintiff, he was in embarrassed circumstances ; and on the 11th of July 1842, he filed his petition to be declared a bankrupt, but had not been so declared when this action was commenced.

It was agreed by the parties, that if the plaintiff, on the foregoing facts, was entitled to recover, the case should be referred to a master or auditor, to assess the damages, and that, upon acceptance of his report, judgment should be rendered for the plaintiff ; otherwise, that judgment should be rendered for the defendants. It was further agreed, that all the papers referred to in the foregoing statement of facts, and not therein set forth at large, should be considered as part of the case.

*B. Rand,* for the plaintiff.

*F. C. Loring,* for the defendants.

HUBBARD, J. Upon the facts stated in this case, the defend-

ants claim the property in the salt, by force of the agreements of April 22d, and November 9th 1841, and they set up an actual possession of it, by virtue of taking possession of the vessel, and of their right to possession by force of the bill of lading. But we are of opinion that the possession in this case was constructive, and not actual, and is dependent upon the right of property. If, therefore, the right of property was in the plaintiff, by force of the mortgage and assignment of the bill of lading to him, the constructive possession of the defendants will not avail them, supposing the plaintiff's action to be rightly brought.

A bill of lading of goods consigned to order, it is said, imports an engagement on the part of the master to deliver the goods to the person to whom the shipper shall order the delivery to be made ; and such person becomes the consignee of the goods. Considering this as a general proposition, there is no doubt of its correctness; but if the shipper be a mere agent for the owner of the vessel and of the cargo shipped, and a new agreement is made between such owner and the consignee named by the shipper, after such consignment, by which the right to the consignment is affected, and in consequence of it the owner assigns his interest in the cargo, the consignee of the shipper cannot hold it, on its arrival, by the mere force of the bill of lading and the order to deliver the cargo to him, against the assignee of the owner. The possession of the bill of lading by the consignee is only *primâ facie* evidence of title, and of a right to the consignment, and may be rebutted by the lawful owner.

The defendants contend that they had the right to the possession of this salt, by virtue of the agreement of April 22d 1841. It is there provided, that "any investments of freight money in merchandize to be made with our [defendants'] consent, and shipment made to our consignment, for sales, on which the usual commissions and guaranty of five per cent. to be charged." This provision is no assignment of such freight, and is a mere agreement for securing a *del credere* commission on the consignment. If, therefore, the cargo —

the proceeds of the freight money — had been consigned to a third person, the defendants could not have maintained a right to the possession of it for the purpose of securing their commission, and their resort must have been to an action on the agreement. But where such freight was invested in merchandize, and the consignment actually made to them, we think they could lawfully claim and hold such consignment, if the agreement which contained the provision still continued in force. But if the agreement had been settled by the parties, and merged in other contracts, the stipulation would fall with the agreement, and the defendants could not claim the consignment, against the superior title of the owner, pro · vided the defendants' claim rested on no other foundation than the agreement.

It has been argued for the plaintiff, that the bond given by Broughton, in October 1841, called a bottomry bond, but in fact a mortgage, was a merger of the simple contract debt provided for in the agreement of April 1841. But this bond or mortgage was given as collateral security only, for the purpose of more effectually making the vessel subject to those claims, and not to cancel or extinguish their prior engagement ; and consequently it could not operate as a merger.

In regard to the advance upon the freight, on the 9th of November 1841, and the transactions growing out of it, we think the master, by sending the bill of lading, indorsed by Burton, to the defendants, gave them such a constructive possession of the salt, on its arrival, that independently of the transactions of March 1842, they would have a good right to claim and retain this cargo, notwithstanding the mortgage and assignment of the bill of lading to the master.

The case turns, in our judgment, on the question whether the transactions of March 5th 1842 were a merger of the preceeding simple contract debts, or were merely collateral securities for the balance of the account then stated.

The facts appear to be these : The defendants were dissatisfied with the manner in which their securities stood, and they proposed to Broughton to make such changes as would

be satisfactory to themselves; and, preparatory to such changes, they stated their account with him, which showed a balance of $34,598·87 in their favor. In that account is charged the $3500 advance on the freight, and a commission of 2½ per cent., $87·50, on such advance, with a premium of insurance of $100 on $4000, the estimated value of the outward freight, and $22·50, commissions for effecting the same; and a further commission, on the outward freight itself, of $54·81, on $4384·65; on which several sums together, making $3765·81, interest is cast to March 1st 1842. We cannot think, therefore, as has been argued by the defendants' counsel, that the subject of the return freight could have been overlooked or forgotten. The settlement of the accounts, showing a balance, including interest to March 1st 1842, of $34,598·87, was made as follows: Broughton gave the defendants three bottomry bonds, one on the Mary Broughton for $17,000, one on the Chusan for $8000, and one on the Zotoff for $5000. And for the balance of $4598·87, a note was given payable in one month, secured by a mortgage on a new vessel building at Newbury, and by a quantity of salt at Marblehead; and if the note should not be paid at maturity, the defendants were authorized to sell the vessel. The parties also agreed, by an instrument of even date, that the property thus mortgaged was more than sufficient to secure the note, and that the surplus should be held as security for the bottomry bonds and interest; with a further agreement, that Broughton would pay them such sums as they might pay for insuring their interest in said vessels, or any of them, as lenders on bottomry.

The bottomry bond on the Mary Broughton was for a loan of $17,000, and a marine interest of eleven per cent., to be paid on the arrival of the vessel from her said voyage to Amsterdam; and in case of loss, the lenders were to have all the salvage; and if the vessel were lost by any of the perils covered by a policy of insurance, agreeably to the form of the Equitable Mutual Insurance Company, against total loss, the obligation was to be void. The bonds on the other vessels

were similar, in their terms, as to payment, and as to securing a marine interest.

These obligations and notes were not taken as collateral security for the balance of the account; they contain no reference to it. And the sums lent on bottomry stand on a higher and different security.

Bottomry is a contract by which the ship, or, as it used to be said, the keel or bottom of the ship is pledged to secure the payment of money borrowed by the owner to fit her for sea, repair her, &c. ; and the agreement is, that if the ship is lost by any of the perils enumerated in the contract, the lender loses his money ; but if the ship arrives safely, or is in safety at the termination of the time stipulated for the repayment of the loan, he is to receive back his principal sum and a marine interest, at the rate agreed upon, though it exceeds the legal interest ; and in this event, the ship and the borrower himself are equally liable to the lender. If such a contract as this, when merely taken as collateral security for another debt to be paid at all events, could be enforced, it would be a means of avoiding the statute of usury, and of thus sustaining illegal and oppressive contracts ; for the creditor would have his remedy on the vessel, and on the insurance ; and on the debtor himself, although the vessel might be lost. He would thus be entitled to the payment of his account and simple interest on it, at all events, and a marine interest on the bottomry bond, in case of the safe arrival of the vessel. If it were not so, it would be a mere mortgage. But these defendants were not satisfied with a mortgage. They chose to put by far the greater part of their debt upon bottomry security and a marine interest ; and they procured the papers to be drawn by counsel learned in the law. It is argued that they did not intend to extinguish the debts due from Broughton, or to release any securities held by them, but only to amend legal defects in the assignment of some of the securities, and not affecting their claims upon this freight. But we cannot act upon after expressed intentions. We must decide the case upon the rights of the parties, as expressed by

their acts at the time, by giving the correct legal meaning and import of those acts. And we are of opinion, that as to the $30,000, the taking of the bottomry bonds was a security differing, not in form merely, but in the nature of the liability, and that it essentially changed the character of the debt from one of simple contract to that of an obligation under seal, and of a peculiar nature, giving the right to receive a higher rate of interest, and putting the principal of the debt at hazard. And in making the proper entries on their books, the bonds would be credited to the account of Broughton ; and, also, the note and the account would be balanced, supposing all the vessels should be lost during the pendency of the marine risk, and by perils covered by the agreement. Could the defendants resort to their account, and call on Broughton for payment, and recharge the bonds to him ? Clearly not. For the bonds would be paid by the loss, and the defendants' only remedy would be on their insurance. But if they were taken as collateral security merely, then the loss of the vessels would touch the subject of security only, and not the matter of the account. The residue of the account ($4598·87) was paid by the note which was fully secured. The case of *Thorndike* v. *Stone*, 11 Pick. 183, has been cited by the defendants' counsel. But that case merely settles that property may be mortgaged to secure the condition of a bottomry bond. If the bond is avoided by a loss of the vessel, then the mortgage also would be defeated by it. And this kind of security, also, the defendants did resort to, by the agreement in relation to the proceeds of the ship and of the salt at Marblehead, after paying the note.

It has also been argued, that in the settlement of March 5th 1842, no allusion having been made to the agreement of April 22d 1841, the parties did not intend to vary it in relation to consignments to the defendants of investments of freight, or in relation to the securities given for the advances ; that even if it was a merger of the debt, it was not a rescission of the contract touching the employment of the vessel. But we are of opinion that the agreement related especially to the

security of the moneys advanced, and the manner in which the defendants should be compensated for their advances. These moneys were charged in the account, and on the payment of the moneys the agreement would be determined. But the change of securities was equivalent thereto. It was a merger and extinguishment of the preëxisting agreements, so far as they remained executory ; and other and new agreements were substituted.

In the view thus taken of the relation of the parties on the return of the barque Mary Broughton, we are of opinion, that the agreement to give the defendants the proceeds of the salt, in part payment of the account, had become extinct ; that the salt remained the property of Broughton, freed from their lien ; and that he had the right to make sale of it, or assign it as security for a debt due from him. The parties might have made a new agreement in relation to the salt, but they did not ; and the old agreement is merged in the new contract. The plaintiff, therefore, has acquired the property in the salt, by virtue of the assignment to him.

It has been further objected, that the plaintiff cannot maintain this action, because there has been no such demand by him, and refusal by the defendants, as to constitute a conversion of the property. If the claim of the defendants had been merely that of a right to sell the property on commission, and to account with the plaintiff for the net proceeds, perhaps no question would have arisen between the parties. But the defendants claimed the property as their own, with a right to appropriate the proceeds independently of the plaintiff's claim ; and we think their insisting on the right to enter the cargo, under the permit from the custom house, in opposition to the master's (plaintiff's) attempt to enter it, and then taking the same from the vessel, notwithstanding his objection thereto, and his again claiming it as his, constituted a conversion of the property, and that the plaintiff can well maintain this action. His act, in sending the bill of lading to the defendants, was in pursuance of orders given prior to the new agreement between Broughton and the defendants, which

were superseded by such new agreement, and Broughton was thereby enabled to give the plaintiff a title, notwithstanding the form of the shipment; Broughton becoming the absolute owner of the property.

According to the agreement of the parties, an assessor must be appointed to ascertain the damage which the plaintiff has sustained, and judgment rendered for him hereafter.